[No. 1372.]

EFFIE HEACOCK *v.* THE STATE.

1. PRIVATE PROSECUTOR—PRACTICE—JURY LAW.—A private prosecutor is one who prefers an accusation against a party whom he suspects to be guilty of an offense against the law; and such person cannot be allowed to try the case as a juror, if challenged for this cause, nor if he be related to a private prosecutor within the third degree of consanguinity or affinity.

2. SAME—CASE STATED.—Pending the trial, the attorneys for the defense notified the counsel for the State that when the case was called for trial they would demand to be furnished a full list of the names of subscribers to a fund for the employment of counsel to prosecute the defendant. The demand was made on the trial, but the list was not furnished, whereupon the defendant appealed to the court to compel the State's counsel to furnish it, and the court declined, upon the ground that the State's counsel could not produce it, but announced that, as the list was not known, and could not be produced, the defendant could ask each juror and witness whether he had subscribed to the fund. *Held,* that such subscribers are not private prosecutors within the meaning of the statute, and the ruling was not error.

3. SAME.—If, in addition to the fact that the party impugned had subscribed to a prosecution fund, it be shown that he entertained a prejudice against the accused, or had established in his mind a conclusion of his guilt, such party would be disqualified as a juror, but such disqualification would not necessarily result from his contribution of pecuniary aid to the prosecution fund.

G

4. SAME.—The rulings of the trial court in organizing the jury are not revisable unless they infringed the law or prejudiced the rights of the accused. To have properly authorized inquiry in this case, it should have been made to appear that it was within the power of the State's counsel to have furnished the defendant with a list of the persons claimed to be private prosecutors; and that such person or persons, or their relatives within the prohibited degree, served as jurors in the trial of the case.

5. EVIDENCE—EXPERT TESTIMONY.—According to elementary authorities, an expert witness is a witness who, on account of the special nature of the subject under investigation, and because of his exceptional knowledge or skill therein, is required to testify with regard thereto. Non-experts testify on familiar matters, but the expert deals with problems involving special scientific attainments.

6. SAME—PRACTICE.—To entitle a witness to be examined as an expert on a specific topic, he must, in the opinion of the court, have special practical acquaintance with the immediate line of inquiry, and the question of the competency of such a witness as an expert is one for the court to determine, and should not be left to the jury.

7. SAME.—The fact that the statute permits the reception of expert testimony in criminal cases does not change the rule as to the value of such testimony, and it should be rejected when it comes in a questionable shape. A witness, to be qualified as an expert, should be shown to have at least a general knowledge of the matter about which he is called to testify.

8. SAME—CASE STATED.—A witness, offered to prove handwriting by comparison, testified that he was not experienced in the comparison of handwriting; that he was not an expert in that respect, but thought that he could tell whether or not two different instruments were written by the same individual. Held, that the witness was not qualified as an expert, and it was error to permit him to testify as such.

9. EVIDENCE—HANDWRITING, to be received as a standard of comparison, must be an admitted manuscript, or must be established by clear and undoubted proof. See this case for evidence which, under this rule, was improperly admitted.

10. SAME.—See evidence in a trial for murder by poisoning, held insufficient to establish the corpus delicti.

APPEAL from the District Court of Van Zandt. Tried below before the Hon. J. C. Robertson.

The indictment in this case charged the appellant with the murder, by poison, of her husband, Cad Heacock, in Van Zandt county, Texas, on the sixth day of July, 1880. Her trial resulted in her conviction of murder in the first degree, and she was awarded a life term in the penitentiary.

W. L. Haynes was the first witness introduced by the State. He testified that he was a resident of Wills Point, Van Zandt county, Texas, in July, 1880, and knew the defendant and her

deceased husband, Cad Heacock, at that time and at that point. Cad Heacock died at Wills Point, in Van Zandt county, on Tuesday, the sixth day of July, 1880. The witness presided over the coroner's inquest in his official capacity. A *post mortem* examination of the body of Cad Heacock was made under the supervision of the witness by Doctors Collier, Reeves and Cox, and occupied perhaps two hours. Captain Owens, Captain Thompson, George Bruce, J. M. Lybrand, Mr. Woodhouse and W. A. Williams composed the jury of inquest.

The witness was of the impression that the defendant was at home at the time of the death of Cad Heacock. C. W. Ball had lived in Wills Point about four years at the time of Heacock's death, and owned property in that town. The defendant and the deceased lived on one of Ball's places, and Ball boarded with them when he was in town. The witness knew that Ball was brought to Wills Point by Deputy Sheriff McLeod shortly after the death of Heacock, but did not know his whereabouts at the time of this trial. Heacock kept books for Gilchrist, and was about thirty-eight or forty years of age at the time of his death. The defendant was thirty or thirty-two years of age, and Ball thirty-three or thirty-five. The deceased was, in the opinion of the witness, a comparatively delicate man, and Ball, in physical development, an average man. The inquest over the body of the deceased was in session four days. The defendant was present when it began. The witness and the jury were at the house of the deceased and the defendant about two hours on the day of the death of the former, and the *post mortem* examination of the body took place there and at that time. The deceased was buried the day after his death, and the defendant was arrested late that evening, after the funeral. Ball was brought into Wills Point on the Friday following.

Several days, but not more than two weeks, after the witness last saw the deceased on the streets before his death, the witness talked to the defendant about the death of Cad Heacock, and she was arrested by order of the witness. Sheriff Hamm did not, to the recollection of the witness, go with him to the house where the body lay at the time of the inquest, nor did the witness remember that another officer than himself, or any person other than those who composed the jury, was present. The witness summoned the jury himself. He did not think that he told the defendant to leave the place when he went to hold the inquest. He told the defendant that some great mistake had

been made in giving medicine, or that foul play had been resorted to. He told her at the same time that if she had any statement to make in her own vindication, she had best make it then. The witness found Mr. Proby at the house when he first arrived. Witness was introduced to the defendant as an officer who had come to hold an inquest over the body of her dead husband. She said that she could not bear to have her darling cut to pieces. The witness then empaneled a jury and retired to a neighboring house to hear evidence from some resident physicians. They shortly returned to the house and told the defendant that a *post mortem* examination was necessary. She replied that she prefered that her own breath be taken from her body. She was requested to retire, and the body was cut open and the stomach and a part of the intestines were taken out. The witness had no further conversation with the defendant that evening.

The witness's next conversation with the defendant was after the burial of the body of her husband. Sheriff Hamm and the gentlemen composing the jury of inquest were present, by request of the witness. No one told the defendant that she could not leave the place. The warrant of arrest was issued by the witness after this. When the witness and his associates went to the defendant on this occasion he told her again that some great mistake had been made in the administration of medicine, or that foul play had been practiced, and that, thinking she might have a statement to make, he had brought the gentlemen with him to hear it, as they were leading citizens. He warned her also that such statement might be used against her. The defendant told the witness and his party that if they thought she was the agent of her husband's death, to look in her face and see if it was not the face of an innocent woman, and said, furthermore, that if she were accused of this crime, she would kill herself and her children. She said that she had more nerve than any of the witness's party. The witness then proposed to search the house; to which she readily assented. The party remained at the house for about one hour. The defendant was arrested about five or six hours later. She made no effort to commit suicide.

During the interview last spoken of, the witness asked the defendant who received letters addressed to M. A. Girly, and she said that she did; that she was Miss M. A. Girly, and that her reason for corresponding under that name was that she had mar-

ried the deceased over the objections of her father, and that her husband had forbid her having any communication with her family. The witness asked her for the letters. She searched a drawer, and replied that she could not find them, but that they were letters from her father, who lived at Galveston. She said that M. A. Overly was a lady friend of hers from Waco, and that Doctor C. Wing was her "own dear uncle from Grand Saline." When she was asked why the letters purporting to have come from her father, who lived at Galveston, were post marked at Grand Saline, she said that it was a terrible lie, that they did not come from Grand Saline; and she became very much excited.

Ed Coleman, who was a witness in this case before the examining trial, the witness Haynes stated, was now dead. Doctor Cox, who was examined before the examining court as an expert, who assisted in making the *post mortem* examination of the body, and who attended the deceased in his last illness, was absent from the State at the time of the trial. Doctors Cox, Reeves and Pabst applied the test for poison.

Various letters were here presented to the witness, and he identified them as documents used as evidence before the examining court. He was of the impression that he received the one marked "Ex. B" from Deputy Sheriff W. M. McLeod. There was in it, when he received it, a paper containing white powder. This letter was opened by the jury of inquest by the witness's direction. A part of the powder was delivered to Doctors Cox and Reeves. The address on the letter was "Dr. C. W. Ball, Wills Point."

The letter marked "Ex. A" was postmarked at Wills Point, and was addressed to "Dr. C. Wing, Grand Saline." The witness could not distinguish the postmark on "Ex. B." The postal card offered in evidence was postmarked at Mineola, and was signed "Dr. C. Wing & C. W. Ball." "Ex. D" was addressed to "Dr. T. L. Wynne, Wills Point." "Ex. E" was addressed to "Miss M. A. Girly." The postmark resembled "Mineola," and it was signed, "Goodbye." "Ex. F" was addressed, "Walter Skeen, Wills Point," and "Ex. G" was the same. "Ex. H" was addressed to "W. Skeen, Wills Point," postmarked "Cleburne," and signed "C. W. Ball." The card marked "Ex. J" is signed "M. A. Overly," and addressed to Mr. Douglass. "Ex. O" was an empty envelope with an indistinguishable postmark, and was addressed to "Dr. C. W. Ball." "Ex. G" was addressed to "Postmaster, Wills Point," signed "M. A. Overly," and post-

marked "Tehuacana." "Ex. K" was signed "M. A.," and was received by the witness from Deputy Sheriff McLeod. "P" was a document signed "Geo. Gilmore." "Ex. J" was a memorandum book taken from Ball. All of these documents, on which the exhibit marks were made by the witness, were used on the examining trial. Some of the names used were the same names spoken of by the defendant in her conversation with the coroner's jury.

The witness had lived at Wills Point since 1872, and had been justice of the peace for about three years. He had never known any one named M. A. Overly or M. A. Girley. Grand Saline was a point on the Texas and Pacific railway, about ten miles east from Wills Point. Mineola is a point about thirty-five miles east from Wills Point; and Longview another, about eighty-five miles east. Tyler is southeast and Tehuacana southwest from Wills Point. These points, and Athens, Waco and Mexia, are all towns in Texas.

The cross-examination resulted in no perceptible change in the testimony of this witness. The search of the house, to which the witness stated the defendant interposed no objection, was made for the purpose of discovering the letters referred to, and traces of poison if possible, as it was the prevailing opinion that poison had been administered to the deceased. The search was conducted by Captain Thompson and Sheriff Hamm, and was fruitless of discovery. The defendant was not present during the dissection of the body. Doctors Reese and Cox and, the witness was of impression, Dr. Collier were present when the defendant made her statements to the witness and the jury of inquest. The witness had not seen the various exhibits since the fall term of the district court in the year 1880. The examining trial of the defendant was concluded in August, 1880, from which time until the term of the district court in November, 1880, they were under the control of the witness. The witness kept them in a trunk which he deposited in the bank. The witness retained possession of the key to the trunk. Ball was brought before the jury of inquest in charge of an officer, and e document marked "Ex. J" was there taken from him.

On his re-examination, the witness testified that a photograph taken from the possession of Ball was exhibited at the examining trial. A lot of ladies' garments were also taken from Ball's saddle-bags, and are still stored in the trunk in the bank. The wit-

ness could identify them.   He did not know what had become of
the photograph.

N. Lewis. for the State, testified that he had been a resident of
Wills Point for some seven or eight years.   He knew the defend-
ant and C. W. Ball, and had known the deceased in his life time.
The witness lived in a house some fifty or sixty steps from and
behind Ball's house, which was occupied by the defendant and
the deceased.   The witness was at the house of the defendant
but once during the illness of the deceased, and that was on the
Friday before his death, which occurred on Tuesday, July 6,
1880.   William Murray and his wife were there when the wit-
ness arrived.   The defendant was not there at first, but she
came in shortly afterwards.   The witness did not know where
she came from.   At that time the deceased seemed to be smoth-
ering, and encountered much difficulty in breathing.   Soon after
the defendant came in, she went to the back part of the house,
and returned with a glass in each hand, each glass containing
medicine of some kind.   The deceased, by putting his arms
around the defendant's neck, raised himself to a sitting posture
in bed, and asked the defendant if both of the glasses contained
medicine.   She replied in the affirmative, and said that one con-
tained quinine, but that she did not know what medicine the
other contained.   The witness remarked that he had never be-
fore known two doses of medicine to be given at the same time.
She replied that she was following the doctor's directions.   The
deceased took both potions, and in a few moments turned over,
asking the witness to quit fanning him, as his smothering sen-
sations seemed to increase in violence.   The liquid in the two
glasses did not differ in appearance, and did not look like qui-
nine.   The deceased remarked that he thought it hard to have
to take two doses at once.   This occurred about twenty minutes
after the defendant came into the house, subsequent to the ar-
rival of the witness, and it was quite late in the evening.

About two weeks before the sickness of the deceased, the de-
fendant was at the house of the witness, and he heard her say
on that occasion that she had to go to the train or the office, as she
was expecting letters.   The witness last saw the man Ball about
the residence of the Heacocks about two weeks before the death
of Cad Heacock.   He saw Ball, the deceased and the defendant
together about the place on that occasion.   He had seen Ball
and the defendant "knocking around" the place very much as a
man and wife would.   He saw them start off buggy riding once

or twice, and had seen them walking around the yard together. During these times the deceased was generally at home or about the town. The witness did not remember having seen Ball about the place except on the occasions mentioned and at meal-times. The deceased was generally at home at meal-times.

The testimony of this witness was not affected by the cross-examination. Ball, he stated, was a dentist by profession, who often made business trips abroad, and apparently made his home with the Heacocks when in Wills Point.

T. J. Melton testified, for the State, that he resided eight miles from Canton and four and a half miles from Wills Point. He knew the defendant and C. W. Ball, and had known the deceased in his lifetime. He saw the defendant and Ball riding together several times some three or four months prior to Cad Heacock's death. He often saw Ball at Heacock's house. On one occasion, when the witness went to deliver a load of wood at Heacock's house, he saw Ball and the defendant lying on a bed together. Their backs were together, and the front door was closed. Cad Heacock was out in town at the time.

The cross-examination of this witness elicited a description of the house occupied by the Heacocks, and the statement from the witness that he was looking through a north window, east of the portico, into the east room, where they were, when he saw Ball and the defendant on the bed together. They were a foot or a foot and a half apart.

W. M. Reeves testified, for the State, that he had been a resident of Wills Point since 1872. He was a practicing physician, and had followed his profession exclusively since 1867. He and Doctor Cox were partners in the practice of medicine at Wills Point in 1880. Doctor Cox, at the time of this trial, was a resident of New York, and was the house surgeon of the Manhattan Eye and Ear Hospital.

On the sixth day of July, 1880, the witness, Doctor Cox and Doctor Collier, by request of the justice of the peace and the coroner's jury, opened the body of the deceased, and removed the stomach and the small intestines entire. These they took to the office of the witness, examined them and tied up the openings to preserve the contents. Their examination of these organs resulted in the discovery of unmistakable evidences of arsenic and strychnine. It was the opinion of the witness and his associate physicians that the strychnine had been in the stomach but a few hours. Limited doses of arsenic will not

produce death unless continued for some considerable time. There were evidences of arsenic in the intestines when they were first opened, some of which appeared to have been there .for some hours, and some of it perhaps for several days. The witness could not say how long it had been there. The strychnine was introduced into the system not more than two or three hours before death. The witness saw the body three or four hours after death. The body was rigid, the muscles of the face drawn and contracted, the head thrown back, and the pupils of the eyes dilated; all of which appearances indicated death by strychnia. The witness could not say now that enough of strychnia was found in the system to produce death. He could not remember now, as well as at the examining trial, the particulars of the various tests which were applied to detect the presence of poison. The witness and his associates made a solution of a part of the contents of the stomach and distilled water, and applied to it what is known as "Marsh's test."

By holding a clean porcelain plate over the flame produced by Marsh's apparatus, if there is the least possible quantity of arsenic in the gas, it will leave a certain deposit on the plate. After preparing to apply Marsh's test, the witness and his associates procured some pure arsenic from the. drug store for experiment. They held the porcelain plate in the flame generated by the gas, and from this obtained the arsenic deposit. They then took a portion of the contents of the stomach and subjected it to the same test by the use of another apparatus, and secured the same deposit as that obtained in their test of the pure arsenic. They made the test for strychnia and discovered its presence, but the witness could not say in what quantities. These tests were applied on the morning after Heacock's death, and in their labor the witness and his associates were very careful, allowing no one but themselves to touch the test, the stomach or the intestines.

This witness testified that arsenic, in appearance, resembles flour with a yellowish tint, and is a mineral poison. The envelope containing a white powder, which was here handed to the witness, was the same which he saw at the examining trial. A portion of this powder was subjected to anlaysis and found to be arsenic. This envelope was marked " B." The witness analyzed but one powder, which was taken from the envelope marked " B," and was handed to him by the jury of inquest. The pow-

der handed to the witness by one of counsel on this trial resembled arsenic, but the witness could not say that it was arsenic. Strychnia, according to the witness, has a whitish, crystalized appearance. The human system will alienate strychnia. If given in medical doses, it acts as an appetizer. In large doses it produces burning in the stomach, acute inflammation and ulcerations of the stomach. The witness and his associates found the bowels of the deceased ulcerated, and also found extravasotic patches of blood. Arsenic produces burning of the stomach, creates intense thirst, but does not produce smothering or choking sensations. A proper dose of strychnia would require about two hours to produce death. Death from strychnia leaves a peculiar expression of horror in the face; the muscles contract, the head draws back and the heels draw under. Arsenical poison, when given for a considerable length of time, leaves a puffy condition of the eyelids, and a peculiar pallor about the face. Given in large doses it produces exhilaration of the patient, intense thirst, and a peculiar metallic appearance about the face.

The shortest time in which strychnia will produce death is about thirty minutes, but the length of time is always regulated by the condition of the system. A sufficient dose of arsenic would produce death within from two or three hours to two or three days, and might, though not probable, produce death in one hour. The stomach as readily alienates arsenic as it does strychnia. The witness was of the opinion that the immediate cause of the death of Cad Heacock was strychnia, and that the remote cause was arsenic.

The witness had known the deceased during his lifetime for one or two years. He went to the house on the day of the inquest, with the coroner's jury and with Doctor Cox. As he and the party approached, he saw the defendant standing in front of her door, looking towards the party. The witness was just passing through the gate when the defendant remarked that she could not bear to see her dear husband cut up. The witness had said nothing to her about having her husband cut up.

This witness testified on his cross-examination that he never treated a case for poisoning by strychnia or arsenic where death ensued, but had seen persons die from these poisons. He had never made an analysis of the contents of the stomach of a person who died from the effects of strychnia or arsenic. He did not see the deceased during his sickness, but would say that he

was a delicate man of some forty or forty-five years of age. He had heard that the deceased was addicted to drunkenness. He, the deceased, was a bookkeeper by profession, and was a man of more than ordinary intelligence.

It requires a great deal of skill and care to make the analysis made in this case. Corrosive sublimate will not make similar deposits on the porcelain plate as that described by the witness. It will make a deposit in some respects similar to that of strychnia and arsenic, but there is a marked difference between them. Each is administered as medicine, and the presence of the smallest quantity of either could be detected by the test applied by the witness and Doctors Cox and Collier. Doses of both are given of one-twentieth part of a grain of strychnia to the fortieth part of a grain of arsenic. The witness did not know how the deceased got the poison. He did not know whether his physician prescribed it or not, nor did the witness know what medicines the deceased took during his sickness. Arsenic sometimes accumulates in the stomach in sufficient quantities to produce death, and will take effect more readily on an empty than on a full stomach. It will allay some kinds of vomiting.

In making their test on the organs removed from the body of the deceased, the witness and his associates used zinc and sulphuric acid. Zinc contains arsenic. Sulphuric acid will kill, and arsenic will produce death if administered in large doses. Calomel is fatal to life if given in sufficient quantities. Bi-chloride of mercury will corrode the stomach. A mild chloride of mercury may contain arsenic. The witness reached his conclusions as to the causes of the death of Cad Heacock from the statements made to him by Doctors Cox and Collier, the condition of the corpse and the analysis of the stomach and intestines; but he saw enough about the body of the deceased, independent of the statements of Doctors Cox and Collier, to authorize his opinion as to the causes of death. The witness was at the house of the defendant only on the day of Cad Heacock's death.

The witness did not think that the body of one dying from the effects of strychnia relaxes after death. One of the associated physicians has the unfortunate habit of getting drunk, and got drunk on the occasion of the *post mortem* examination. The witness and his associates used tests to ascertain whether or not the stains on the porcelain plate were produced by antimony, which is a mineral corrosive poison. They also tested for platina, but for no other poison. Antimony or platina may be mis-

taken for arsenic unless the test is properly applied.  The witness, some six months before this test was made, operated the apparatus used on this occasion.  In graduating in medicine, the witness took a special course in chemistry.  Chlorine is a mineral poison, and the witness thinks that, if combined with mercury, it makes corrosive sublimate.  Corrosive sublimate is a deadly poison.

Chlorine is taken freely, and when administered in proper doses is harmless.  It is not used in general practice.  The witness did not then know the combination of chloral.  It would kill, but the witness did not think that it would combine with any other medicine in the stomach and form a poison.  All of the contents of the stomach of the deceased were not used in making the test.  The stomach contained nothing but liquid when it was taken out.  All the tests applied to the stomach and intestines were made within thirty hours after the stomach was removed.  Tests were made several times for a week or ten days after the death of Cad Heacock.

Charlie Reeves was next presented as a witness for the State. He testified that he resided at Grand Saline, Van Zandt county, Texas, in July, 1880.  He was then engaged in the mercantile business, and in connection with his general stock carried a stock of drugs.  He was also postmaster.  The witness knew Doctor Ball, and saw him occasionally about two or three weeks before the death of Cad Heacock.  The first time that the witness saw him he asked for letters in the name of C. Wing, received them and opened and read them.  He then asked for letters for C. Wing and Doctor C. W. Ball.  The witness asked him who Ball was, and he said that he was the man, and that his reasons for receiving letters addressed to C. Wing were that he was having some fun with a girl whose parents objected to him, and she corresponded with him in his two given names (C. Wing), leaving his surname, Ball, off.

On the second or third day of July, Ball purchased some articles from the witness, including a dime's worth of arsenic.  The witness asked him what he wanted with arsenic, and he replied that he was a dentist, and used it to kill the nerves of teeth. After purchasing the arsenic, he went out to his buggy and returned presently with a yellow envelope in his hand, and asked the witness where the letter-box was situated.  At this time he exhibited to the witness a "gem" picture of a lady, and asked how the witness liked her looks.  The witness returned the pic-

ture to him, and had not seen it since. If it was exhibited to him on the examining trial the witness did not remember it.

The witness had resided at Grand Saline about fifteen months, and had been postmaster since January 1, 1880. He had never heard of a person named C. Wing, as living there or in that neighborhood. The next time the witness saw Ball was on the train, in custody of deputy sheriff McLeod. Exhibit "B" was here presented to the witness, and he testified that he first saw it at Grand Saline. He mailed it there, and next saw it at Wills Point. The witness did not know who put it in the postoffice at Grand Saline, but the envelope is about the same size and of the color of the one that he saw Doctor Ball have in his hand at Grand Saline. It is postmarked in the handwriting of the witness.

The letter marked "Exhibit A" was received at the postoffice at Grand Saline the day on which Doctor Ball left there. The witness gave it to Doctor Ball on the train, while Ball was in the custody of deputy sheriff McLeod. The witness first saw the postal card marked "Exhibit B" at Grand Saline. It was received at the postoffice through the mail, and was delivered to some one of the officers. This was the only communication he ever received from Ball. Ball had two letters in his hand on the day that he purchased the arsenic, but the witness did not know to whom they were addressed. When Ball showed the witness the picture spoken of, it fell out of the case, and the witness picked it up. Ball said it was the picture of the girl with whom he was having some fun.

On his cross-examination the witness testified that he delivered the letter marked "Exhibit A" on the train. The officer demanded the letters addressed to Ball or Wing, but the witness delivered the letter to Ball. The witness knew that he mailed the letter marked "Exhibit B," from the fact that the month and the day is written inside of the postmark. This was his only means of knowing the fact. Doctor Monk was present when Ball purchased the arsenic. He inquired for strychnia, and the witness replied that he had none. Doctor Ball then said he would take some arsenic, as he was a dentist and used it in his practice. He did not inquire for arsenic until the witness told Monk that he had it.

John E. Owens, one of the jury of inquest, was next introduced by the State. Touching the incidents at the house of the defendant at the time of the inquest, and the interview between

the defendant and the justice and coroner's jury, he corroborated the testimony of the first witness, Justice Haynes, in almost every particular. He testified, however, that the defendant first objected to the inquest and then consented. She denied that the deceased died from the effects of poison, and declared that he was a drinking man and used opiates. She avowed that if the physician had understood the case, the deceased would not have died. She was first warned that she was not compelled to make any statement regarding the case, but persisted upon her own responsibility, saying that her maiden name was Ainsworth, and that her father was a resident of Galveston. She said that letters in the name of "M. A. Girly" were intended for her, and were so addressed by her father because her husband objected to her keeping up communication with him. She said that Miss M. A. Overly was a lady friend who visited her from Galveston, and that C. Wing was an uncle of hers who lived at Grand Saline. When told that the letter which she said was received from her father at Galveston was mailed at Grand Saline, she pronounced it a terrible lie, and declared that it came from her father at Galveston. The witness had previously lived at Galveston for ten years, but had never known any person there named Girly.

Touching his qualifications as an expert in the comparison of handwriting, the witness testified that he had been in the banking business for about five years, and was more or less experienced in handwriting. He had never had any correspondence with Ball, and had never seen him write. The clerks of the witness conducted most of his business correspondence, and all drafts were presented to his bookkeeper. During the first years of the witness's business as a banker, his partner did most of the business correspondence and bookkeeping. The witness had never practiced comparison of handwriting much, and did not consider himself an expert. He had never, previous to this trial, been called into court to testify as an expert in handwriting, and he had never studied handwriting by comparison. He knew absolutely nothing of C. W. Ball's handwriting. While in business in Galveston, he kept a book of signatures, and referred to it occasionally, but never succeeded in detecting fraud in that way. To the question, "Can you, by comparing two written instruments, tell whether or not they were written by the same person?" the witness answered, "I think I can. I do not consider myself an expert at comparing handwriting, but I am of

the opinion I can tell handwriting by comparison. There is much greater difficulty in identifying inferior handwriting by comparison, than good handwriting."

With reference to the various letters or written documents that were here presented to the witness, he testified as follows: "Exhibits 'F' and 'H,' I think, were written by the same person. 'G,' I think, was written by the person who wrote 'F' and 'H.' 'D,' I think, was written by the party who wrote 'G.' Exhibit 'E' is in the same handwriting as the others. Exhibit 'B' is only an address on the back of an envelope, which contains a white powder, and this address, I think, was written by the hand which wrote the other exhibits spoken of. I saw this last at the examining trial, and I don't think there was any letter in it then. I think it then only contained a white powder. It now contains a white powder and some scraps of paper. I cannot tell whether it contains the same amount of powder now as then. I opened this exhibit 'B' at the examining trial, but do not remember who gave it to me. Exhibit 'O,' I think, is in the same handwriting as the others. In exhibits 'C' and 'J' there is a variation in the signature, but I think they were written by the same hand as the others. I take these to be the same from the peculiar handwriting, and the peculiar shape of some of the letters, and in my opinion they were all written by the same hand. Exhibits numbers 1, 2 and 3, I think, are in the same handwriting as the others. Exhibits 'A' and 'K' were written, I think, by the same hand. The handwriting of both are very inferior. The handwriting in the other exhibits is very inferior, but some better. There are two different handwritings in the exhibits. 'A' and 'K' appear to be the same, but they are different from all the other exhibits."

The cross-examination resulted in no material change in the testimony of this witness. He testified that he contributed money to pay an attorney to conduct the prosecution of this defendant and Ball in the examining court. Judge Crow was paid out of the fund raised for his services in the examining court, and is still in the case for the prosecution. When the coroner's jury went to the defendant's house on the second day, the defendant said that had she known she was suspected of having poisoned the deceased, she would not have objected to the *post mortem* examination. The witness restated his conclusions respecting the various exhibits, and reiterated that he did not pretend to be an expert. It took the witness some time to so

familiarize himself with the various documents as to be able to express his opinion respecting them. While the coroner's jury was in session, and examining Doctor Ball, the postmaster handed Ball the exhibit marked "B," and the jury took it from him and opened it. Ball was then under arrest. Exhibit "E" was taken from the defendant by the jury and opened. The witness was of impression that he got exhibit "A" from Deputy Sheriff McLeod. He got exhibits "B" and "E" from Sheriff Hamm. Exhibit "C" he got on the table in the room in which the sessions of the jury were held. Exhibit "D" he got from W. A. Williams, a member of the jury. "F," "G" and "H" came into the hands of the jury while they were in session. A magnifying glass was not used in the examination of the letters.

The witness was present and saw the valise and dental case of Doctor Ball opened. Two powders, one a white and the other of a yellowish color, were found in Ball's dental case. They found nothing in a phial or paper resembling strychnia or arsenic. The parties who examined the defendant's house found no poison or other substance calculated to throw any light on the matter under investigation. The witness took a substance from the mantelpiece which looked like quinine. The defendant said that the deceased was a drinking man, and used opium.

W. L. Haynes, recalled by the State, testified that the bundle handed him he believed to be the same which was used in evidence before the examining court. It was a bundle of ladies' wearing apparel, and was taken from Dr. Ball after his arrest. When taken, they were placed in a trunk, and the trunk deposited in Owen's bank. The trunk was not deposited in the bank office, nor in the safe, but in the room to which parties go to transact business with the bank.

C. H. Reeves was recalled by the State, and testified that he had seen a person who resembled the photograph. In the opinion of the witness, the defendant was the original of the photograph shown him by Ball. During the examining trial the defendant was in charge of an officer, and was pointed out to the witness as Mrs. Heacock.

Mrs. Jenny Reynolds testified, for the State, that she knew Ball, the defendant and the deceased. She was at the funeral of the latter. The witness saw the defendant at the grave that day, and at her house after the burial. She had a talk with the defendant on the day of Cad Heacock's death. She appeared very much dissatisfied with the treatment of the doctors, and said

that she intended to go to Mineola and get Doctor Fowler, and to Longview and get Doctor Wing, and have them return with her and examine the body. She seemed much distressed, and spoke of going to her father, and asked if the witness would take care of her children and forward her baggage if she should conclude not to return. She appeared unquiet when she saw the jury approaching her house, and asked if they were trying to prove that she poisoned her husband. She also spoke of going to a Doctor Wing, who she said was a married friend of hers, and would assist her and furnish her money with which to return and liquidate her debts.

The cross-examination was immaterial. The witness's attention was called to the fact that she had testified before the examining court that the conversation detailed as occurring between herself and the defendant took place on the day of the burial of the deceased, instead of, as stated on this trial, on the day of his death. She replied that, as the facts were fresher in her mind when she testified before the examining trial, her statement there was doubtless correct. When the defendant spoke of going off, she also said that she purposed returning the next day; that she had been informed that the doctors claimed to have found poison in the body, and she desired to have it re-examined under the supervision of her friends.

C. T. Reynolds testified, for the State, that he was at the house of the deceased during his illness. Two or three days before the death of her husband, the defendant came to the house of the witness to get something to relieve the deceased, who, she said, was suffering greatly. The witness saw the deceased occasionally during his sickness. Apparently he suffered greatly with a kind of spasmodic affection. He saw Doctor Cox give the deceased one or two doses of medicine, which always seemed to quiet him. The witness saw the defendant at his house, about four o'clock on the evening of the day of the burial. She asked advice from the witness about getting some of her physician friends to examine the body. She said that she had friends at Quitman and Longview, and asked if she had not better go after them. The witness advised her against such course; to which she made no reply. She said nothing to the witness about her children or baggage.

The witness stated, on his cross-examination, that he was at the defendant's house at least twice during the sickness of the

H

deceased. The defendant appeared to be as attentive to the deceased as any wife the witness had ever seen.

J. C. Austin, who lived a distance of fifteen miles from Wills Point, and between that town and Grand Saline, testified that he saw Ball at the house on the third and fifth days of July, 1880. When he left his house on Saturday, July 3, he said that he was going to Wills Point, and when he returned on Monday, July 5, he said that he had been to Wills Point. He had with him the picture of a lady in a gutta percha case.

Oscar Pabst testified, for the State, that he knew the deceased, the defendant and Ball. Ball was a dentist. About three weeks before the death of Heacock, the witness sold Ball ten cents worth of arsenic.

Frank Gready testified that he was a druggist. On or about the first day of April the witness sold Ball some arsenic. Ball said that he wanted it to make nerve paste for teeth.

Cross-examined, the witness stated that Ball purchased creosote and quicksilver at the same time he purchased the arsenic. On the morning of the death of Cad Heacock, George Heacock came to the witness's drug store and said that he wanted some seltzer for Cad Heacock.

A. J. Gilchrist testified, for the State, that he knew all the persons concerned immediately in this investigation. He had known Ball about five or six years, and the deceased, who was the witness's bookkeeper at the time of his death, about two years. He had never seen the deceased drink any. The deceased took sick on Wednesday, the last day of June, 1880. The witness saw him on Thursday. The postoffice in Wills Point adjoins the witness's store. He saw the defendant at the postoffice once during the sickness of the deceased. She then asked the witness if he had mailed a letter she sent him for that purpose, addressed to Dr. C. Wing, Grand Saline. This occurred, the witness believed, on the Friday evening before the death of the deceased. The defendant's little boy handed the witness a letter addressed to Doctor C. Wing, Grand Saline, to mail for his mother, the defendant. The letter envelope marked "Exhibit A," in evidence, is the one. The witness recognizes it by the formation of the initial letter. It is a double "C," one written over the other. It was sealed up when the witness mailed it. The witness has seen the defendant get mail at the postoffice and return through his store and put postal cards on

the deceased's desk.   The witness did not see Ball in the town of Wills Point on the Sunday before the death of Heacock.

The witness admitted on his cross-examination that he was one of the private prosecutors in this case.   He had seen the defendant in his store showing mail to the deceased which she had taken out of the postoffice.   Cad Heacock was sick when the witness mailed the letter sent to him by the defendant.   The witness did not say anything about the double "C's" on the address of the letter mailed by him for the defendant, at the examining trial, for the reason, he supposed, that he was not then asked about it.

Doctor T. L. Wynne testified, for the State, that he had known Ball for some three or four years.   Ball and the witness were both dentists.   Ball's practice was a traveling practice, and not very large.   Arsenic is used by dentists in their practice; by some in its raw state, and by some in a nerve paste; in larger quantities by some, and in smaller quantities by other dentists. The witness had seen Ball write, and received from him one letter, which is the one now shown the witness.   The witness was not acquainted with Ball's handwriting.   He told Ball afterwards that he had received his letter and answered it, addressing the answer to Tyler.   Ball said that he did not receive the answer.   He did not say that he wrote the letter to the witness, but spoke of some of the matters mentioned in the letter.   Ball had been off on a trip, and said he had been to Corsicana, Tyler, Athens, Tehuacana, and Waco.   The witness saw the defendant at the postoffice once during the sickness of her husband, and asked her about Ball.   She told the witness to come down and she would tell him.

Cross-examined by the defense, the witness stated that an ounce of arsenic, if used with care, would last a dentist a whole year, but, as it is inexpensive, dentists waste a great deal.   The witness was at the house of the defendant during the progress of the examining trial.   There was no window or opening on the north side of the house in the east room.   There was a door at the east end of that room, with a panel of glass in the upper part of it.   A person standing on the outside could not look through the glass in that door, and see persons lying on the bed. The witness went to the house during the examining trial to see if there was a window on the north side of the east room, and found there was none.   He went around to the door and found that no one could see over it into the room.   The west room has

a window on the north side next to the portico, through which a party standing on the ground might see persons on the bed.

Doctor T. B. Collier testified, for the State, that he had been a practicing physician for thirty years. He was called in to see the deceased before daylight on the first day of July, 1880. The defendant was waiting on him. He was in a sinking condition when the witness reached him. He had been taken sick the day before, and had cold extremities and a spasmodic affection. The witness administered bromide of potash and anti-spasmodic, to allay the nervous pains and spasmodic contraction. These antidotes "would have little effect either way, and would not increase the effect of the poison." The witness remained with the deceased on this first visit some two or three hours. He rubbed the patient and administered whisky, but no strychnia. Heacock revived and grew much better. The witness was there again on the next Friday or Saturday. The deceased appeared much improved, and the witness thought he would steadily and speedily get well. The witness next saw him when he was dying. He was then undergoing general jerking pains and great suffering. He could not swallow nor take medicine prescribed, and died in convulsions, suffering greatly. Doctor Cox was present at his death. The attention of the witness was called to the feet of the deceased, which were drawn inwards and contracted. The witness had treated the deceased for a spree about two months before. It was the opinion of the witness that the immediate cause of death was strychnia, and that arsenic was the remote cause.

This witness was subjected to a very rigid cross-examination by the defense. He stated that Linn Robertson came for him when he was first called in to attend the deceased, and at subsequent times, and told the witness that he was sent by the defendant. Doctor Cox had prescribed for the deceased on the day before the witness was first called in. On this first visit the witness administered whisky and ginger, which appeared to relieve the patient of his spasmodic contractions. Neither whisky and ginger nor bromide of potash are antidotes for strychnia or arsenic. Doctor Cox and the witness reached the conclusion that the deceased was suffering from hysteria, and treated him for that, though they did not thoroughly understand the case. The deceased was a delicate man, over forty-five years of age. When the witness treated him for drunkenness, which was generally the case when he treated him at all, he gave him morphine

and a stimulant. The witness stated on the examining trial that morphine was administered to the deceased on the occasions of his visits. The witness himself administered two or three ounces of whisky, and the whisky and ginger seemed to relieve the patient. The witness did not know what medicines Doctor Cox had been administering. The witness advised the application of a blister to the spine, and understood from the family that it gave the patient relief. Ice was being used when the witness was called in, and he advised that it be continued. Vomiting from gastritis or burning in the stomach is very common. The witness had never before seen death from strychnia or arsenic.

Congestion will produce nausea or burning in the stomach, and, if the spine becomes involved, convulsions will ensue. Calomel produces nausea when it begins to act on the bowels. The witness did not treat the deceased for strychnia or arsenic, but at the time of his death the witness thought from the attendant convulsions that he had taken strychnia. Men are as liable to hysteria as women, and whisky and ginger, or morphine, will relieve hysteria. The defendant was the nurse of the deceased, and she appeared to the witness to be very attentive to him, and the witness noticed nothing suspicious about her conduct. His suspicions had been aroused concerning the case, and he noticed the conduct of those about the deceased closely, but detected nothing in any of them. The defendant conducted herself very affectionately towards the deceased, and always insisted on the witness remaining longer with him, and returning often. She appeared anxious to be about the deceased.

The witness handled the body after death, but failed to notice any particular rigidity about it, though he noticed that the feet were inverted. He was present part of the time when the tests were being applied by Doctors Reeves and Cox. Strychnia in the system is very difficult of detection, for, being a vegetable poison, it is readily and rapidly absorbed. Physicians, as a general rule, have very little practical knowledge of chemistry, and the witness, though a graduate in chemistry, did not consider himself a good chemist. He did not think that he could make a test for strychnia which could be relied on with safety, and to make a test for arsenic he would have to experiment considerably. Cox had been practicing medicine some two or three years. Pabst and Reeves prepared the apparatus for the application of Marsh & Rench's test. The witness saw the deposits on the

plate. It was a common jeweler's plate. A glass was used to inspect these deposits. Zinc is said to contain arsenic. Cox and Reeves were better posted in chemistry than the witness, but the latter had never heard that, besides this case, they had ever had any practical experience in chemistry. The witness stated again that he was not chemist enough to make a test for strychnia or arsenic which he would consider certain or infallible. He and Doctors Cox and Reeves agreed that the test they made for strychnia was difficult and uncertain. The witness did not know what kind of a vessel was used in heating the contents of the stomach. The witness did not know how long Doctor Reeves had been practicing medicine, but knew that he had graduated in medicine but recently before the test was made. Scientific men disagree in regard to these tests for poison, some holding them entirely reliable, while others do not. Physicians sometimes give poison by mistake. The witness sent Robertson to Bowen's drug store for whisky for the deceased. He had never prescribed strychnia or arsenic for the deceased, nor did he regard the deceased as dangerously ill as the deceased believed himself. He never prescribed a treatment in which two doses were to be administered at once. George Heacock came after the witness on the morning of the death of the deceased. The witness told him that the deceased was unduly alarmed, and he replied that when the witness saw him, he would change his mind.

Re-examined by the State, the witness stated that he and Doctor Cox reached a negative conclusion about the case. It was a singular case, and hard to diagnose. In making the tests, books which Cox and Reeves regarded as authority were consulted with regard to symptoms. Oscar Pabst, who is an educated chemist, assisted in making the tests.

Mrs. E. James testified, for the State, that she knew the deceased, the defendant and Ball. The witness did the defendant's washing during the spring of 1880. The pillow-case of which profert was now made, and which was marked "C. W. Ball," the witness had seen before. The defendant exhibited it to her, and said that she made it for Ball. The lady's drawers, now in evidence, the witness had also seen. They are the property of the defendant, and the witness had washed them for her.

The witness, on cross-examination, could not tell how long it had been since she last saw the pillow-case and drawers. Her attention was called to them at the examining trial. The

drawers are made of cotton flannel. Most ladies wear drawers made of cotton goods—cotton flannel in winter, and lighter domestic in summer.

W. L. Haynes was recalled by the State and placed upon the stand the third time. He testified that the lady's gown exhibited had on it the name "Effie" when it came into the possession of the jury of inquest. This gown, and the pillow-case and lady's drawers in regard to which the last witness testified, were taken from a pair of saddle-bags by the jury of inquest. The saddle-bags and C. W. Ball were brought into the jury room by W. M. McLeod, deputy sheriff.

J. T. Douglass, postmaster at Wills Point, was subjected to a rigid examination by the State, and as rigid a cross-examination by the defense. He testified, on his examination-in-chief, that he knew the defendant, the deceased and Ball. Ball was a younger and stronger man than the deceased. He did not see Ball about Wills Point during the sickness of the deceased, nor did he remember when he saw him last before that event. Ball received mail at the Wills Point postoffice frequently. The witness had seen him write, and was familiar with his handwriting. Mail frequently came to the office addressed to Effie Heacock. The defendant got mail also in the name of M. A. Overly and M. A. Girly. She received letters in these names for some three weeks or a month before the death of Cad Heacock. The witness remembered this particularly by the fact that one of these letters was overweight, and he demanded of her when she called for it the payment of the three cents extra due, and she went to her husband in Gilchrist's store and returned with a nickel, with which she paid the due postage and took the letter. She received two postal cards in exchange, which she gave to her husband, and she put the letter in her dress pocket. This was about a week before her husband took sick, or before he died; the witness did not remember the time exactly. That letter appeared to have a powder in it. It felt like the package in the envelope marked "Exhibit B." The defendant received several letters in the names mentioned, which witness thought he recognized. She received another letter along about the first of July, and if he could see it again, the witness thought he might know it. The letter marked "Exhibit B" was here handed to the witness, and he said that this letter, or the one addressed to Mrs. or Miss M. A. Girly, came to the postoffice. The witness could not remember the color of the envelope, but the one marked "Exhibit

B" was the one to which he referred. The witness delivered it to Captain Hamm.

The witness could not remember the address on the other letter, nor was he certain about the postmark. It came in the same mail with exhibit "B," and contained something similar to that which was contained in exhibit "B," and which felt like a powder. They were postmarked "Grand Saline, July 3, 1880." The witness noticed other letters from Grand Saline at the same time. The defendant gave the witness positive orders not to deliver these letters to any person other than herself, not even her husband, and not to let him know anything about them. She had orders from the other parties, Girly and Overly, for the letters. The defendant never inquired for letters addressed to Ball.

The witness did not remember the letter marked "Exhibit A," but had seen letters addressed like it. The address on the envelope marked "Exhibit B" is in Doctor Ball's handwriting. It contained a powdered substance, and no letter. The address on the envelope marked "Exhibit E," and postmarked Mineola, July 7, and the letter which it contains, are both in the handwriting of Doctor Ball. Exhibits marked "G," "C," "J," "I," "1," "2" and "3" are all in Doctor Ball's handwriting. The witness noticed at the time that these letters were all addressed in Doctor Ball's handwriting, and suspected at the time that something was going on. The witness saw these letters at the examining trial. He was well acquainted with Ball's handwriting, and had frequently seen him write. The witness was in Wills Point during the entire time of Cad Heacock's sickness, but did not see Ball during that time.

The witness stated on his cross-examination that he was one of the subscribers to the fund raised to pay counsel to prosecute this case. The witness did not remember circulating a list on which money for the prosecution was raised. If he so stated on the examining trial, then his statement was true. Upon reflection the witness was of impression that he did so state before the examining court. The witness had never seen the defendant deliver a letter to her husband. The witness so testified on the examining trial.

The witness got the letter marked "Exhibit B" out of the post-office after the arrest of the defendant and Ball, and gave it to sheriff Hamm. He was not authorized by Ball to deliver the letter to Hamm. The letter marked "Exhibit E" came to the

postoffice on the eighth day of July, while the inquest was in progress. The witness did not deliver it to the defendant. The witness swears to Ball's handwriting to the best of his knowledge and belief. Exhibits "P" and "E" are not in the same handwriting. "P" and "B" are similar. "E" is not like them.

The witness had known Ball some five or six years. He did not always use the same signature, the difference being principally in the "C." In exhibits "O" and "J" the same word is spelled differently—"mail" in "O" and "male" in "J." The witness assisted the deputy sheriff in the arrest of Ball, at the deputy's request, and guarded Ball after his arrest.

C. R. Donnelly testified, for the State, that in 1880 he lived in Mineola, Texas, and was constable of that beat at that time. He heard of the circumstances of Heacock's death. He saw Ball on the day after he heard of Heacock's death, and arrested him about three miles east of Mineola, going toward Longview. The witness turned Ball over to deputy sheriff McLeod. He took some baggage from him which he left at the hotel at Mineola. Among his baggage was a valise and a pair of saddle-bags. He had with him a small skillet, some flour and bacon, some quilts and a gun and pistol. When arrested Ball had stopped to camp for the night.

The witness went through Ball's pockets and searched his baggage at the hotel for fire-arms. He did not notice for or see any lady's garments in his baggage. The witness might have noticed a lady's gown and drawers if any such articles had been in his baggage. The baggage was turned over to McLeod. There was nothing in the saddle-bags but a vest. The witness was looking for nothing but arms, and did not notice particularly. Ball did not resist arrest, but returned with the witness willingly.

George Heacock, a nephew of the deceased, testified, for the State, that he was with the deceased often during his last sickness. The deceased lived in a house of three rooms which belonged to Ball, about a half mile east from the railroad depot. There was an unoccupied house situated about twenty yards east of the house occupied by the deceased and the defendant. The witness saw the deceased on the Sunday night before the Tuesday of his death, at about eight o'clock. When the witness went into the house, he met the defendant at the north door, going out. She returned in a short while, but the witness did not know where she had been. The defendant administered medicine to the deceased while the witness was at the house.

The deceased seemed to be resting easy on that Sunday night. The witness was about the house the greater part of the time during the sickness of the deceased, and was there when he died on Tuesday morning. He went for the doctor on that morning. About ten minutes before the witness started for the doctor, the defendant gave the deceased a dose of medicine which she said was quinine. The deceased had been quiet for about a half hour before this medicine was given him, and in about ten minutes after he swallowed it he went into convulsions. The witness saw the defendant the day after the death of the deceased. She then said she wanted to go to Quitman to see Doctor Fowler, and to Longview to see Doctor Wing. The witness did not know Doctor Wing. Up to the death of Cad Heacock, the witness had never heard of such persons as M. A. Girly, M. A. Overly, or Doctor C. Wing. He had never heard of the family having such acquaintances, though he had lived in the house with them for three or four years.

The witness testified on his cross-examination that he was not at the house when the deceased was taken sick, but arrived on the Sunday night thereafter, and remained with him until his death. By request of the defendant, he sat up with the deceased often during his sickness. The deceased made no objection to taking the medicine on Sunday night. Mr. Murray was not at the house when the witness arrived. According to the written testimony taken before the examining court, the witness stated on that trial that Murray was present. Notwithstanding he is so represented in that written testimony, he made no such statement at the time. When the witness got to the house on Sunday night, and met the defendant at the door, she told him that Mr. Heacock was very sick, and asked him to go in and stay until she returned. The witness did not say on the examining trial that the defendant met him at the door on Sunday night, notwithstanding he is represented as saying so in the written testimony at the time.

The deceased said that he did not want to take medicine. The defendant did not say what kind of medicine it was she gave the deceased. The last dose of medicine was given about half-past nine o'clock on the Tuesday morning of Heacock's death. The witness believed that Mr. Murray remained over night at the house on Tuesday night. The deceased sent the witness after a bottle of seltzer, a half bottle of which the witness got for him at Lillard's drug store. The witness did not tell Doctor Mang-

hon when he went for the seltzer. The deceased had been taking calomel, and wanted something to move his bowels. He did not remember the day, but thought it was the Tuesday of the death of the deceased, in the morning, that he went for the seltzer. The witness did not assist in giving medicine. The doctor did not prescribe seltzer, nor did the witness remember how the doctor told him to give it. The written testimony represents the witness as having said before the examining court that it was on Monday morning that he went for the seltzer. He may have so stated, but he did not remember.

The witness was of impression that he had spoken to Mr. Kearby about prosecuting the defendant. The witness was keeping a bar in Wills Point. He had never seen the defendant mistreat the deceased. Her treatment of him always appeared to the witness to be kind and affectionate. She requested the witness to remain with the deceased during his sickness. The witness was at the house on Monday night. Mr. Murray also spent that night at the house. The defendant lay down across a bed in the room that night, and told Murray how to give the medicine, and directed him to give it at certain periods if the stomach of the deceased could receive it. The deceased had vomiting inclinations that night and through his entire sickness. He had jerking and crying spells on Monday night.

The witness had never seen any improper conduct between the defendant and Ball. When Ball was in Wills Point he made the house of the deceased and the defendant his home. The deceased was in the habit of getting on sprees and grew nervous and excitable when getting over them. The defendant said that the medicine she was administering was quinine and calomel. It is possible that the witness might have assisted in supporting the deceased when medicine was administered to him. The witness could not remember when he got back with the half bottle of seltzer, but, when he did, he placed the bottle on the table and said: "Here it is." Doctor Manghon told the witness how to give it. The witness was positive that he did not mix, nor assist in giving the seltzer, though he might have told the defendant how to give it. The deceased had hiccough often during his sickness.

Ex-deputy sheriff W. M. McLeod testified, for the State, that on Wednesday, the day after Heacock's death, he saw Doctor Ball at Mineola in charge of constable Donnelly. Witness took charge of Ball in his official capacity, and conducted him to

Wills Point. Ball had with him a small grip-sack. His other baggage was at the hotel. The witness took Ball to the depot for the night, and brought him on to Wills Point next day, and delivered him and his baggage to the jury. The saddle-bags were unpacked by the jury, and some lady's underwear, wrapped in a newspaper, was taken from them.

The witness took the letter marked "K" and the memorandum book marked "I" from Ball at Mineola, and turned them over to the jury of inquest. The book was partly torn when it came into the possession of the witness. The witness recognized the letter by the date. He first saw exhibit "A" in the hands of the postmaster at Grand Saline, who gave it to Ball on the train. The witness took the letter from Ball, and turned it over to the jury of inquest at Wills Point. When the postmaster gave Ball the letter, he put it in his pocket, and the train had run four or five miles before the witness took it from him.

D. W. Crow testified, for the State, that he was an attorney employed to prosecute in this case. With reference to the exhibits he testified: "I have here exhibits 'B,' 'P,' 'A,' 'F,' 'K,' 'G,' 'D,' 'O,' 'Jc,' 'Q,' 'H,' 'E' and pages '1,' '2' and '3' of exhibit 'I.' I first saw them during the examining trial. I saw them all marked as they appear now. After that trial I did not see them again until indictments were found against the defendant and Ball. I got them from one of the grand jurors and from the district clerk. I identify them all as the same I saw on the examining trial, only they are worn more, and the one containing the powder is considerably diminished. I put them in the county treasurer's safe."

This witness stated on his cross-examination that he did not know who delivered these exhibits to the grand jury. They were turned over to justice Haynes at the request of the witness. The witness obtained them indirectly from the grand jury, and carried them home and put them in his trunk. He took them to Mineola once. McCord, the former district attorney, once had them in possession.

T. J. Hamm testified, for the State, that he delivered one letter to Ball, and he thinks two to the defendant, while both were under arrest. The witness received exhibit "E" from the postmaster.

On cross-examination the witness stated that Mr. Douglass gave him one letter. The jury of inquest sent him to the post-office for it. He delivered it to Ball in the presence of the jury,

and they immediately took it from him. The witness delivered one letter to the defendant and took it from her instantly. These letters were delivered to these parties merely as a matter of form.

Tom Murray testified for the State that he was at the house of the deceased on the Thursday or Friday night before he died. During the previous spring or summer the witness gave to the defendant a letter inclosed in a letter to him from Doctor Ball. That letter was sealed.

The State here read in evidence from a memorandum book marked "Exhibit I," the part of a page marked "1," page marked "2" and page marked "3," as follows:

"Left Wills Point 19th May. Left Cleburne 5 May. Got to Waco 8 of May. Left Waco 16th of May. Got to Tehuacana 18th of May. Left do 4th of June. Got to Athens 7th of June. Left do 15th of June. Got to Tyler 16th of June. Left do 19. Got to Grand Saline 20th. Arrived in Athens on the 7th June, 1880. T. J. Rodgers lives on Clear Creek 10 miles from Athens."

The prosecution then read exhibit "Q, " as follows:

"TEHUACANA, May 31st.

"*To Postmaster, Wills Point, Texas:*

"Postmaster—Sir: You will please send my mail to Tyler, and oblige, &c.

"M. A. OVERLY."

Exhibit "B" was then put in evidence by the State. It was an envelope containing a white powder, postmarked "Grand Saline, July the 3d," and addressed: "C. W. Ball, Wills Point, Texas."

Exhibit "A" was next read by the State. The envelope was postmarked, "Wills Point, July 2, 1880," and was addressed to "Dr. C. W. Ball, Grand Saline." Its contents, a letter, read as follows:

"JULY THE 2D.

"My dear one: I wrote you yesterday. Mr. H. is still alive. I don't think he will live more than two or three days. I can't say what to do. I can't leave until he is dead or better. I be withe you soon, dear. If you want me to do as I promised, I will leave all and go with you. My dear I am yours, and will do as I told you, for I will live for my dear deare. You will

send me one more dose of the bitters. I will be free of all. If you think you will be in danger of anything, you can write to me and tell me what to do. I will come as soon as I can. I will pack up as soon as I am free. That will not be long if you will send me some more of the same. I am giving quinine all the time. If you will tel me what to do, I will do as you say. If you want to see me first, you can come Sunday night to the new house. There is no one there. Send the medison by the first mail. If you don't come, write me and tell me how to do, and where to go to. Deare, if you can tell all about wheare to take my stove or not, I will do as you say. I think I will be able to raise means to pay my way to where you will go. Deare, you watch out for yourself. I don't want yo be caut. Tuesday is the day the land is to be sold. Thear has bin several ast me where you was at. I told you was gone to Galveston. Write me a long letter and tell me as to what to do. Come if you want to when he is dead. I ship all and set a day for you to come. I will be glad to go withe you in the bugey. You can tell me as you think best. I wish you would send me at once. I hope it wont be long. I look for you to write me. Think not I will forget my word. I have been up for three nights. He asleep now. Goodbye deare. Write by the first mail."

Exhibit "K" was then put in evidence by the prosecution. It read as follows:

"JUNE THE 13TH.

"My dear darling: After waiting so long, I received your kind and welcom letter, which was read withe great pleasure. Well, dear, I had come to the conclusion that I had lost my darling, which gave me great trouble, more than I thought could stand. The last time I heard from you Cleaborn. I did not get any mail from Waco but wrote 9 letters to you. I got one by Tomie from Athens. That is the last time I hurd. Tomie gave me the one you wrote to me. I was sick but have been better since I hurd from you. Darling, I have bin all most dead, and would no dout bin dead if you had not wrote to me when you did. I hope I will never live to see the day I feel as I have felt about you. I tried to forget my sorrow and wait to see if you was dead or marred, but it give me great relief to hear you, my dear, still living and waiting for one that love you so dear as I do. Oh deare! how happy it makes me feel to think my deare darling is coming to see me. Oh dear, darling, God send the

---

---

hour, I pray. Wel, dear, I have wrote you fore letters to Tyler while I was sad when I wrote to you, for I thote I had lost you, and did not want to live no longer, for you are all to me. You will feel sad when you read my letters, tho I will still live and wait for my deare one. Oh, yes! deare, live for you and no one else. Wel, deare, as I have wrote you before, I write you a short letter. I shall look for you. I will go to church. I will meat you about the gate. I will kiss your seet lips once more. We will drive off and talk over old times. I will feel bad if you fail to come. Well, dear, it is dark. I will close for the olde hog is coming. I wish he was dead. Goodbye, dear darling. Come soon.

"Your true one.

"M. A.

"Dear Tommie is here to-night. Direct cleare."

The evidence on behalf of the State was closed at this point.

W. C. Manghon was the first witness introduced by the defense. He testified that he was a physician, and in 1880 was practicing his profession at Wills Point, having his office at that time in Lillard's drug store. He remembered the circumstance of the death of Cad Heacock. On the morning of his death, about eight or nine o'clock, George Heacock came to Lillard's drug store for seltzer, and said that his uncle, the deceased, had been taking calomel and wanted something to move his bowels. The witness gave him a bottle about half full of seltzer. He got the bottle from the shelves. Will Collier and A. M. Dean were clerking in the drug store at the time. One of them is now in Arkansas, and the other at Sulphur Springs, Texas. The witness directed George Heacock how to give the medicine. The seltzer which the witness gave to George Heacock was a part of a bottle which had been opened by the boys about the drug store, and they had, the witness thought, been using out of it. It had been on the shelf for some time, and was old.

The witness stated on his cross-examination that he did not notice the seltzer particularly, and did not know that the clerks had taken any of it. Arsenic and seltzer have the same appearance. Strychnia has a skull and cross bones on the bottle label. Seltzer is labeled with a trade mark only.

W. A. Murray was next introduced by the defense, and testified that he remembered the circumstances of the death of Cad Heacock. He learned that Heacock died on a Tuesday in July,

1880. The witness was at the house of the deceased twice during his last sickness, on the Friday night, and on the Monday night before his death, on which occasions the witness sat up with him. On these occasions the deceased was taking medicine, and was quite sick. The deceased told the witness that he left the store on Thursday evening, and went by Doctor Cox's office and got and took two doses of medicine, and that after he took the medicine he got worse. The defendant was very attentive to the deceased during his sickness. On Friday night, while the witness was at the house, he was invited to return. The witness went by the house late on Monday and stopped to learn how the patient was doing. The defendant, who was out at the door, sweeping, insisted that the witness should go in and see Mr. Heacock. The witness went into town, but returned later and remained all night. George Heacock was then at the house. The defendant appeared very much fatigued, and the deceased insisted that she should go to bed. She retired at about eight or nine o'clock, and got up about two o'clock. George Heacock gave ice to the deceased during the night. When the defendant got up, she said there was quinine to be given to Mr. Heacock, if his stomach would retain it. The deceased was very sick on Monday night, and the witness, who had seen several cases of congestion, and lost two children by that disease, thought that the deceased had congestion. When the witness left in the morning he told those about the house that if Mr. Heacock did not improve soon he would die that day. The witness left the house a little after sun up, and did not expect the deceased to live until ten o'clock.

The opinion of this court discloses the errors assigned, and all other matters of importance.

*C. B. Kilgore,* for the appellant, filed an able and exhaustive brief.

*H. Chilton,* Assistant Attorney General, for the State.

Willson, J. The defendant was indicted for the murder of her husband, Cad Heacock, by poisoning him with arsenic and strychnine. At the November term, 1881, of the district court for Van Zandt county, she was tried upon this indictment and found guilty of murder in the first degree, and her punishment assessed by the jury at confinement in the penitentiary for

life. She has appealed from this conviction to this court, and assigns various errors in the proceedings of the court below, and because of these errors, asks a reversal of the judgment.

The first error assigned is: "The court erred in refusing to compel the State's counsel to furnish the defendant with a list of private prosecutors in this cause, as set out in bill of exceptions No 1." By reference to bill of exceptions No. 1, we find that a subscription had been raised to obtain money to employ attorneys to prosecute the defendant upon this charge; that the defendant's attorneys, on Monday before the case was called for trial on Wednesday, notified the State's counsel that a full list of the subscribers to this fund would be demanded on the trial; that when the case was called for trial defendant's counsel demanded said list of the State's counsel, and it was not furnished, and thereupon defendant's counsel demanded of the court to compel the list to be furnished, which the court declined to do, because the State's counsel could not produce it; but the court announced that, as the list was not known and could not be produced, the counsel for defendant could ask each juror and each witness the question whether or not he had subscribed to the prosecution fund.

The first question that presents itself under this exception is: Were the persons who subscribed money to aid in the prosecution of the defendant private prosecutors within the meaning of the law? If they were, then they would not be allowed to try the case as jurors, if challenged for this cause; nor would they be allowed to sit as jurors, if challenged, if they were related to a private prosecutor in the case within the third degree of consanguinity or affinity. (Code Crim. Proc., Art. 636.) We do not think, however, that the mere fact that a person has paid, or promised to pay, money to aid in the prosecution of a person charged with crime is sufficient to constitute the person thus aiding a private prosecutor within the meaning of the statute.

Mr. Bouvier defines a private prosecutor as follows: "A private prosecutor is one who prefers an accusation against a party whom he suspects to be guilty." (Bouvier's Law Dictionary, title Prosecutor.) A person might furnish money to aid in the enforcement of the law against a suspected criminal, and yet be perfectly impartial in respect to the accused party. He might not even know the suspected party, or the crime with which such party is charged, or any of the facts connected with the case. Of course, if, in connection with the fact that he had

rendered pecuniary aid to the prosecution, it was shown that he entertained a prejudice against the accused, or had established in his mind a conclusion as to his guilt, he would be disqualified to serve as a juror in the case. But this disqualification would be on other grounds than that the pecuniary aid extended to the prosecution by him rendered him a private prosecutor. We hold, therefore, in this case, that the persons who subscribed to the fund being raised to employ attorneys to prosecute the defendant were not thereby rendered her private prosecutors.

We think, furthermore, that, even if they were private prosecutors, the question is not presented in such a manner as to call upon this court to revise the action of the trial court in regard thereto. It is not made to appear that it was within the power of the State's counsel to furnish the defendant with a list of the persons claimed to be private prosecutors; nor is it made to appear that any such persons, or the relatives of any such persons within the third degree of consanguinity or affinity, served as jurors in the trial of the cause. The rulings of the trial court in organizing a jury are not revisable unless they infringe the law or prejudice the accused. (*Ray* v. *The State*, 4 Texas Ct. App., 450; *Gardenhire* v. *The State*, 6 Texas Ct. App., 147.)

The second assignment of error is unimportant. The third assignment is as follows: "The court erred in permitting John E. Owens, witness for the State, to testify as an expert as to handwriting by comparison, without first qualifying as an expert, as appears by bill of exceptions No. 3."

The witness Owens was introduced by the State. He testified that he had been engaged in the banking business about five years, and was more or less experienced in handwriting—that his clerks did the most of his corresponding, etc. He had little occasion to exercise in comparing handwriting, and did not consider himself an expert,—was never before called to testify in a case as an expert; seldom had occasion in his business to compare handwriting; thought he could tell handwriting by comparison; thought he could by comparing two written instruments, tell whether or not they were written by the same person; did not consider himself an expert in comparing handwriting. Having thus stated, this witness was permitted by the court, over the objections of the defendant, to testify as an expert in the comparison of handwriting, and to state his opinion that certain letters and the superscriptions upon certain envel-

opes presented to him, and which were afterwards read in evidence by the State, were in the same handwriting.

It is provided by our Code of Criminal Procedure that " It is competent in every case to give evidence of handwriting by comparison, made by experts or by the jury." (Art. 754.) The question here presents itself, was the witness Owens shown to to be an expert? In order to determine this question we must first ascertain what constitutes such an expert.

Mr. Bouvier defines experts generally as follows: "Experts are persons who are selected by courts, or the parties in a cause, on account of their knowledge or skill, to examine, estimate, and ascertain things, and make report of their opinion." (Law Dictionary, title "Expert;" *Speiden* v. *The State*, 3 Texas Ct. App., 156.) Mr. Wharton, in his excellent work on Criminal Evidence, says: "An expert has been defined to be a witness who testifies as to conclusions from facts, while an ordinary witness testifies only as to facts. This definition, however, is not sufficiently exact. No witness called to detail facts reproduces such facts as they really exist. Apart from the psychological question whether what we see is immediately perceived by us, such acts are inferred, not actually witnessed.   *   *   * We must therefore proceed further when we seek to distinguish between the expert and the non-expert. And the true distinction is this: that the non-expert testifies as to a subject matter readily mastered by the adjudicating tribunal; the expert to conclusions outside of such range. The non-expert gives the results of a process of reasoning familiar to every day life; the expert gives the results of a process of reasoning which can be mastered only by special scientists." (Whart. Cr. Ev., sec. 404.) The same author also says: "To entitle a witness to be examined as an expert in a specific topic, he must, in the opinion of the court, have special practical acquaintance with the immediate line of inquiry." (Whart. Cr. Ev., sec. 406.) The question as to the competency of a witness offered as an expert is one for the court to determine, and should not be left to the jury. (Whart. Cr. Ev., sec. 406.)

In *Speiden* v. *The State*, 3 Texas Ct. App., 156, two bank tellers were held to be competent to testify as experts as to handwriting. Judge White, in delivering the opinion in that case, says: "In this case it is objected that the witnesses testifying did not qualify themselves as experts. We do not think the objection tenable. They were both tellers of banking houses in the city

of Dallas; one having had four years and the other two years experience in such position, where they were daily passing upon the genuinenness of signatures, and paying hundreds of checks, and both thought themselves experts and competent to judge of handwriting."

We are of the opinion that the facts in this case in relation to the competency of the witness Owens to testify as an expert in the comparison of handwriting are not sufficient to qualify him as such expert, and we think the court erred in permitting him so to testify. As has been well said in *Jones* v. *The State*, 7 Texas Ct. App., 457, in discussing the subject of proof of handwriting by comparison: "The fact, however, that our statute permits such evidence does not change the well established rules as to the value of such testimony. Such evidence has always been considered feeble, and in some States unsafe to act upon." It may be added that the English rule is to exclude such testimony entirely, and that rule has been pronounced by our Supreme Court to be the better rule, and such was the rule in this State until the enactment of Article 754, Code of Criminal Procedure, which expressly provides for the admission of such testimony; and such is believed to be the rule now in civil causes in this State. (*Hanley* v. *Gandy*, 28 Texas, 211.) This character of evidence, therefore, being weak at best, it ought never to be admitted when it comes in a questionable shape. A witness who is offered for the purpose of affording such evidence should be shown to have at least a general knowledge of the matter about which he is called to testify. This witness stated that he had no experience in comparing handwritings, was not an expert in that respect, though he thought he could tell whether or not two different instruments had been written by the same individual. The instruments in regard to which he was permitted to testify as an expert were afterwards introduced in evidence in the case, together with his *opinion* in regard thereto, and formed the most material evidence for the prosecution that was adduced upon the trial. It is fair to conclude that the verdict of the jury was influenced by this evidence to the prejudice of the defendant. It being necessary to the State's case to use this character of evidence, it should have produced the best attainable, men experienced in handwriting, and in the comparison of handwriting, and not relied upon the testimony of a witness who, as confessed by himself, and as shown by his statements as to his practice and experience, was not an

expert in comparing handwriting. "One who does not profess to be an expert in handwriting, and whose avocation in life has not been such as to qualify him to judge of handwritings, should not be permitted to testify as an expert." (*State* v. *Tompkins,* 71 Mo., 613.)

The fourth, fifth and sixth assignments of error relate to the same matter presented in the third assignment, and which we have above determined. The seventh assignment of error has not been insisted upon, and is not important.

The eighth, ninth, tenth and eleventh assignments of error all relate to the same subject and will be considered together. The theory of the prosecution, in this case, seems to be that the defendant and one C. W. Ball *alias* C. Wing, a dentist, were guilty of an adulterous intercourse with each other, and conspired together to murder the husband of the defendant, Cad Heacock, by poisoning him, and did in fact thus murder him, the defendant administering the poison, which had been supplied her by her paramour. To establish this theory the evidence adduced is entirely circumstantial. The most material portions of this evidence, and that upon which the verdict of conviction was based, are certain letters which are claimed to be in the handwriting of the defendant, and which were found in the possession of Ball *alias* Wing, after the death of the deceased; also, certain envelopes, and the handwriting thereon, one claimed to be in the handwriting of Ball *alias* Wing, and the other to be in the handwriting of defendant. It is only necessary that we consider the letters and the address upon the envelope which are claimed to be in the handwriting of defendant.

It was proved by the witness Owens, who was permitted to testify as an expert, that, in his opinion, the handwriting on the envelope, and the handwriting of the two letters read in evidence, were the same handwriting. The envelope in question was directed to "Dr. C. W. Ball, Grand Saline," and was mailed at the postoffice at Wills Point, Texas. The defendant at the time the letter was mailed resided at Wills Point, and Doctor C. W. Ball *alias* Wing was at that time at Grand Saline. The circumstances proved in regard to this envelope tend very strongly to show that the defendant mailed or caused it to be mailed. But no one saw her write it, and there is no proof whatever that it was her handwriting, and she at no time admitted that she wrote it. There is no direct effort to prove her handwriting,

but the effort is to establish by circumstances that the envelope in question was directed by her, and that she caused the same to be mailed. This direction upon the envelope is made the standard of comparison by the witness Owens, and by the court and jury, in determining whether or not the two letters read in evidence were written by the defendant.

It is a well established rule that the handwriting used as a standard of comparison must be either an admitted manuscript, or be established by clear and undoubted proof. The evidence establishing it as a standard must be either direct, or equivalent to direct. (*Eborn* v. *Zimpleman*, 47 Texas, 503; *Phillips* v. *The State*, 6 Texas Ct. App., 364; *Hatch* v. *The State*, 6 Texas Ct. App., 384; 1 Greenl. Ev., Sec. 581.) We do not think the proof by which it is claimed that a standard of handwriting was established in this case is of that clear and undoubted character which the law requires. We think the court erred in admitting in evidence the envelope and the two letters, over the objections of the defendant.

There are a number of other assignments of error, but they are such as are either substantially embraced in those we have discussed, or are of a nature not likely to arise on another trial, and we shall therefore only notice the last one, which is, because the verdict of the jury is contrary to the evidence. We do not think, in view of another trial of this cause, that it would be proper for us to comment upon and compare the evidence. We will make this remark, however, by way of suggestion, that in our opinion the proof of the *corpus delicti* is exceedingly meagre and unsatisfactory. If in fact the deceased came to his death by poisoning, it occurs to us that this fact could be more satisfactorily proved than is shown in the record. In other words, the expert testimony upon this subject, as presented in the statement of facts, is not of that perfect and conclusive character which we have a right to expect from men who profess to be skilled in the science of medicine. The judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 8, 1882.